850 F.2d 694
 271 U.S.App.D.C. 1, 56 USLW 2723, 18
Envtl. L. Rep. 21,035
 NATIONAL WILDLIFE FEDERATION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Intervenor.
Victoria BERES, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 Nos. 86-1317, 86-1389.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 6, 1987.
Decided June 10, 1988.
 
 Charles H. Montange, Washington, D.C., was on the brief for petitioners National Wildlife Federation, et al. David Burwell, Washington, D.C., also entered an appearance for petitioner Rails to Trails Conservancy.
 Daryl A. Deutsch, Bellevue, Wash., was on the brief for petitioner Victoria Beres.
 Evelyn G. Kitay, Atty., I.C.C., with whom Catherine G. O'Sullivan, Donald S. Clark, Attys., Dept. of Justice, Robert S. Burk, General Counsel, and Ellen D. Hanson, Associate General Counsel, I.C.C., Washington, D.C., were on the joint brief, for respondents. Laura Heiser, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent U.S.
 John B. Norton, Washington, D.C., was on the brief for intervenor Association of American Railroads.
 Daniel William Wyckoff, Asst. Atty. Gen. for the State of Wash., Olympia, Wash., was on the brief for amici curiae States of Wash., La., and Fla.
 Before EDWARDS, STARR and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 These consolidated cases seek review of the Interstate Commerce Commission's final rules implementing Sec. 8(d) of the National Trails System Act, 16 U.S.C. Sec. 1247(d) (Supp. IV 1986) ("Trails Act"), a statute that governs the conversion of abandoned railroad rights-of-way to nature trails. In the rules under review, the Interstate Commerce Commission interpreted Sec. 8(d) to provide only for voluntary transfers of rights-of-way from railroads to trail operators and determined that such transfers would not result in a "taking" of the property of the holders of reversionary interests in the rights-of-way. The National Wildlife Federation ("NWF"), petitioner in No. 86-1317, challenges the ICC's determination that Sec. 8(d) does not authorize it to compel a railroad to transfer a right-of-way to a nature trail operator.[1] Petitioner in No. 86-1389, Victoria Beres, is a landowner whose property is subject to an existing railroad right-of-way. She contends that the Commission's regulations authorize the taking of her property without just compensation.
 
 
 2
 We conclude that the Commission was not unreasonable in deciding to read Sec. 8(d) as authorizing only voluntary transfers of rights-of-way, and we therefore deny NWF's petition for review. We disagree, however, with the Commission's conclusion that the application of its rules may never constitute a taking of the reversionary interests of property owners whose land is subject to a railroad right-of-way. We therefore grant Ms. Beres's petition in part and remand the case so that the Commission can reconsider its rules in light of their possible effect upon the interests of reversionary owners.
 
 I. BACKGROUND
 
 3
 Congress enacted the Trails Act in 1968 in order to establish a nationwide system of nature trails. Pub.L. No. 90-543, 82 Stat. 919 (codified as amended at 16 U.S.C. Secs. 1241 et seq. (1982 & Supp. IV 1986)). Congress reserved to itself the right to designate scenic and historic trails, and delegated to the Secretaries of the Interior and of Agriculture the authority to designate recreational trails, and to develop and administer the entire trail system. See 16 U.S.C. Secs. 1243, 1244, 1246. Section 7(e) of the Act, 16 U.S.C. Sec. 1246(e), provides that the land necessary for a designated scenic or historic trail may be acquired by state or local governments, or by the federal authorities, through cooperative agreements with landowners or by purchase. In the event that all voluntary means for acquiring the right-of-way fail, the appropriate Secretary is given limited power to obtain private lands through condemnation proceedings. See 16 U.S.C. Sec. 1246(g).
 
 
 4
 As originally enacted, the Trails Act made no specific provision for the conversion of abandoned railroad rights-of-way to trails.[2] Congress's first effort to encourage this type of adaptive re-use appeared in Sec. 809 of the Railroad Revitalization and Regulatory Reform ("4-R") Act of 1976. P.L. 94-210, Title VIII, 90 Stat. 144 (codified as amended at 49 U.S.C. Sec. 10906 (1982)). Section 809(a) of the 4-R Act required the Secretary of Transportation to prepare a report on alternative uses for abandoned railroad rights-of-way. Section 809(b) authorized the Secretary of the Interior to provide financial, educational, and technical assistance to various government entities for programs involving the conversion of abandoned rights-of-way to recreational and "conservational" uses.[3] Section 809(c) authorized the ICC to delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property at issue had first been offered on reasonable terms for sale for public purposes (including recreational use). 49 U.S.C. Sec. 10906 (1982).[4]
 
 
 5
 Congress renewed its effort to promote the conversion of railroad rights-of-way to trail use when it enacted the current Sec. 8(d) as part of the 1983 Trails Act Amendments. See Pub.L. No. 98-11 Sec. 208, 97 Stat. 48 (codified at 16 U.S.C. Sec. 1247(d) (Supp. IV 1986)). Divided into its three component sentences, Sec. 8(d) provides as follows:
 
 
 6
 1. The Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage state and local agencies and private interests to establish appropriate trails using the provisions of such programs.
 
 
 7
 2. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with the National Trails System Act, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.
 
 
 8
 3. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this Act, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.
 
 
 9
 Initially, the Commission proposed to adopt an implementing regulation that interpreted Sec. 8(d) to require that an about to be abandoned right-of-way be transferred to a qualified operator that agreed to assume full responsibility for its operation as a trail. See Rail Abandonments--Use of Rights-of-Way as Trails, 50 Fed. Reg. 7200 (Feb. 21, 1985). The Commission received more than 100 written comments on the proposed regulation. NWF and several other commentators supported the ICC's proposed rule, while the Department of Transportation, the National Park Service, and others opposed it. Ms. Beres argued that, as applied to her property, the proposed regulation would work an unconstitutional taking without compensation and urged the Commission to adopt a case-by-case approach to right-of-way conversion in order to avoid such takings.
 
 
 10
 The Commission's final regulation rejected the mandatory interpretation and concluded that Sec. 8(d) contemplates only voluntary arrangements between railroads and would-be trail operators. See Rail Abandonments--Use of Rights-of-Way as Trails, 2 I.C.C. 2d 591 (1986) (hereinafter "Trails Act Rules" or "Rules"). In reaching this result, the Commission emphasized that a railroad right-of-way is private property that is entitled to protection under the fifth amendment and must be acquired for public use through condemnation proceedings. The Commission observed that Sec. 8(d) contains neither an express delegation of condemnation power to the Commission, nor terms implying that such a delegation was intended, nor any procedures governing the conduct of condemnation proceedings. Id. at 597. (Nor does the legislative history provide any indication that Congress intended to delegate a condemnation power in Sec. 8(d).) The Commission also noted that the mandatory rule it initially proposed was not necessary to carry out the primary purpose of Sec. 8(d), namely, to prevent railroad rights-of-way operated under easements from reverting to their grantors when they are abandoned by the railroads, an event that would effectively preclude their conversion to recreational use. Id.
 
 
 11
 In keeping with its interpretation of the Trails Act, the Commission adopted specific procedures designed to encourage the negotiation of voluntary trail use agreements. While the details of these procedures vary depending upon the type of abandonment, the Rules generally require notice to potential trail operators and, if the railroad indicates a willingness to consider such use, time to negotiate an agreement. If such an agreement is concluded with a qualified trail operator, the railroad will be allowed to discontinue current service while retaining the right to resume rail operations on the line in the future. In the interim, the right-of-way may be used as a trail as long as the trail operator continues to assume responsibility for the property.[5]
 
 
 12
 The Commission's decision acknowledged that the operation of its Rules might serve to defeat the reversionary interests of adjacent landowners; indeed, it interpreted this as the "main purpose" of Sec. 8(d) of the Act. See id. Nonetheless, the Commission rejected Ms. Beres's claim that her reversionary interest was "property" that would be "taken" through such ICC-sponsored interim trail use. The Commission reasoned that "[s]ince the amendment provides that interim trail use under section [8(d) ] shall not constitute abandonment of rights-of-way for railroad purposes, the railroad easement continues and reversionary interests do not mature." Id. at 600.
 
 
 13
 NWF and Ms. Beres then filed separate petitions for review, which were consolidated here. We have jurisdiction over the petitions by virtue of 28 U.S.C. Secs. 2321(a), 2342(5) and 2343 (1982).
 
 
 14
 II. DOES Sec. 8(d) REQUIRE MANDATORY TRANSFER OF RIGHTS-OF-WAY?
 
 
 15
 We consider first petitioner NWF's claim that Sec. 8(d) requires the Commission to transfer rights-of-way to qualified trail operators even when the railroad opposes such use. In reviewing the agency's interpretation of this statute, we must determine whether "Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If Congress's intent is clear, then any inconsistent regulation must be set aside. If the statute is silent or ambiguous, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782.[6]
 
 
 16
 We begin our analysis with the language of the third sentence of Sec. 8(d), set out above. NWF contends that the use of the word "shall" in that sentence demonstrates that Congress intended to make the transfer of a right-of-way to a qualified operator mandatory. The word "shall" in that section presumably requires that the Commission act according to its terms. More specifically, the sentence requires that, under certain specified conditions, the Commission "shall not permit abandonment or discontinuance inconsistent or disruptive of" interim trail use. One undisputed condition is that a state or local government or a qualified private trail operator agree to "assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way." (Emphasis added).
 
 
 17
 NWF argues that once these specified responsibilities are assumed, the Commission must provide for interim trail use regardless of the railroad's wishes. As the Commission notes, however, the use of the phrase "such transfer or use," when read in light of the previous sentence, suggests that the third sentence becomes operative only when the trail proponent has already obtained the right to interim use of the right-of-way "pursuant to donation, transfer, lease, sale or otherwise in a manner consistent with [the Trails Act]." The Commission argues further that, as each of these terms implies a voluntary conveyance, the third sentence of Sec. 8(d) means nothing more than that the ICC must give a certificate for interim trail use when a voluntary agreement for such use has been reached between a railroad and a qualified trail operator.
 
 
 18
 We agree with NWF that two of these terms, namely "transfer" and the catch-all "otherwise in a manner consistent with [the Trails Act]" might well be read to comprehend a mandatory conveyance; if forced conveyances were elsewhere authorized, these terms would be broad enough to include such transfers within their scope. There is no other source of authority to require transfers of rights-of-way, however, and nothing in the Act requires the Commission to interpret those terms as implicit grants of such authority.[7] Thus, while the Act clearly requires the Commission to allow for trail use in cases of voluntary agreement, it is far from unambiguous in commanding the Commission to force such a use upon an unwilling railroad.
 
 
 19
 The conspicuous absence in Sec. 8(d) of any explicit condemnation power further supports the Commission's interpretation of the statute. There can be little doubt that the Commission was correct in concluding that the mandatory reading advocated by NWF would require the Commission to exercise such power, at least in cases where the railroad owned the right-of-way in fee.[8] The language of Sec. 8(d), however, not only does not authorize the Commission to "condemn" or to "take" railroad property, it does not specify any procedures to be used in appropriating such property and provides no guarantee of just compensation. In this respect, Sec. 8(d) is in marked contrast to Sec. 7(g) of the same Act, 16 U.S.C. Sec. 1246(g), which expressly authorizes condemnation proceedings. See supra at 697, 700 n. 7. In view of this contrast between Sec. 8(d) and another section of the same statute, the Commission's reluctance to read the third sentence of Sec. 8(d) to require mandatory transfers of railroad property is entirely reasonable.[9]
 
 
 20
 Our conclusion is not altered by anything in the legislative history of the Trails Act amendments. A 1983 House report, the relevant part of which is set out in the margin,[10] is the only substantive history of Sec. 8(d). NWF points to the last sentence of the second paragraph, which, viewed in isolation, would provide some support for its position, at least if one were prepared to believe that Congress would blithely fail to mention that it intended the trails program to operate without regard to the objections and interests of the abandoning railroads. In any event, the implication NWF would have us draw from this sentence does not coexist well with the "key finding" at the outset of the same paragraph, viz. that "interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes." This passage lends credence to the Commission's argument that Sec. 8(d), by preventing a reversion of the right-of-way upon its abandonment for rail use, was intended merely to make it possible for a willing railroad to make a voluntary interim transfer of the right-of-way for use as a trail. At bottom, however, neither of these snippets of legislative history can conclusively resolve the issue of whether Sec. 8(d) authorizes the ICC to mandate the transfer of a right-of-way when a railroad declines to enter into a transfer agreement. After this brief excursion through the almost equally brief legislative history of Sec. 8(d), therefore, we remain where the language of the statute left us under Chevron, which is to say, obliged to defer to the ICC's interpretation of the law it administers if that interpretation is not unreasonable.
 
 
 21
 NWF suggests two extrinsic reasons for setting aside the Commission's reading of Sec. 8(d) as unreasonable. First, NWF argues that, so interpreted, Sec. 8(d) is "purely repetitive of pre-existing law," namely, 49 U.S.C. Sec. 10906. See supra n. 4; NWF Brief at 26. The Commission has demonstrated that this criticism is unfounded:
 
 
 22
 Section 10906 has no rail banking provision that would preempt state laws that could otherwise result in reversion of rights-of-way to abutting landowners upon a cessation of rail service. Thus, if part or all of a particular right-of-way is held under such an easement or reversionary interest, the trail developer would need to invoke Section [8(d) ] to prevent reversion of easement property and maintain the integrity of the transportation corridor.... On the other hand, as the Commission explained [in the Rules], Section 10906 may be more desirable to the trail developer than Section [8(d) ] if the railroad owns the right-of-way, because it could purchase the property outright and avoid the risk of losing the right-of-way to restored rail service.
 
 
 23
 ICC Brief at 28-29.
 
 
 24
 Second, NWF contends that, as interpreted by the Commission, the third sentence of Sec. 8(d) is "not only superfluous but irrational" because there would be no need to allocate responsibilities between the railroad and the trail operator by law, if all trail use agreements are to be voluntary. NWF Brief at 26-27. The Commission concluded that the management, tax, and liability provisions in the third sentence of Sec. 8(d) were intended as "incentives for railroads to consider interim trail use proposals." 2 I.C.C.2d at 598. We do not agree that this reading of the statute "makes absolutely no sense." NWF Reply Brief at 9. In order to encourage interim conversions of rails to trails, Congress had to meet not only the problem of reversions upon abandonment but also the problem that a railroad may have little to gain from facilitating interim use of its right-of-way as a trail. Its incentive to do so is a function of the probability that it will want to resume rail service over the right-of-way at some later date, a possibility that will be preserved if trail use can prevent abandonment. Congress might reasonably conclude that in marginal cases a railroad will be more willing to deal with a would-be trail operator if it is assured in advance that the negotiating costs of reaching an agreement will be low because key terms have been specified by law and agreed to in advance by the other party.
 
 
 25
 In sum, the language and legislative history of the Trails Act, as amended, plainly enough demonstrate that Congress intended to promote the transfer of railroad rights-of-way to trail operators by removing the impediment posed by existing reversionary interests. On this all hands agree. Regrettably, Congress did not speak with comparable clarity to the question whether such transfers are to be mandated when a railroad is unwilling to enter into a voluntary agreement. Faced with this ambiguity in the statute, which it forthrightly acknowledged in its Notice of Proposed Rulemaking, the Commission determined, in light of the substantial condemnation problem presented by a mandatory reading of the statute, that it was empowered by the Act to approve only voluntary agreements. We can hardly say that this choice was unreasonable.[11]
 
 
 26
 III. DO THE TRAILS ACT RULES RESULT IN A "TAKING" OF THE
 
 
 27
 REVERSIONARY INTERESTS?S?
 
 
 28
 The Beres petition raises a constitutional challenge to the Trails Act Rules. Beres is the owner of waterfront property located in the State of Washington. Along the waterfront, between her home and the water, runs a railroad right-of-way 200 feet wide. According to Beres, this right-of-way is an easement for railroad purposes only and, under Washington law, it will revert to her in the event that railroad operations cease. She argues that the Trails Act Rules, by permitting a trail operator to take possession of the right-of-way upon termination of rail service, authorize a "taking" of her property without just compensation.[12] See U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.")
 
 
 29
 The Beres challenge to the Trails Act Rules requires a brief examination of the property rights of those who own reversionary interests in railroad rights-of-way. Existing rights-of-way were created by voluntary conveyance or through condemnation proceedings. See Schnabel v. County of DuPage, 101 Ill.App.3d 553, 57 Ill.Dec. 121, 428 N.E.2d 671, 676 (1981). Some of these rights-of-way consist of fee simple interests that may be transferred or used by the railroad for non-railroad purposes once the Commission authorizes abandonment of rail service; these rights-of-way are not affected by the takings clause aspect of this case. Other rights-of-way are specifically limited to railroad use and may revert to the original owner (or a successor in interest) if railroad use is discontinued. While these more limited interests, which do implicate the takings clause, take a variety of forms, the two most common types are the fee simple determinable and the easement. If the right-of-way is a fee simple determinable, title to the underlying land vests in the railroad and the grantor (or successor) retains only a reversionary interest (known as a "possibility of reverter"). See, e.g., Oregon Dep't of Transp. v. Tolke, 36 Or.App. 751, 586 P.2d 791, 795-96 (1978). If the right-of-way is an easement, the owner of the servient tenement retains title to the underlying land and may be entitled to use the right-of-way in any manner that does not interfere with the railroad's use. See, e.g., Veach v. Culp, 92 Wash.2d 570, 599 P.2d 526, 527-28 (1979).[13]
 
 
 30
 Many, but not all, of these rights-of-way are creatures of state law.[14] In such cases, the interest retained by a property owner whose land is subject to a railroad right-of-way will depend upon the language of the instrument conveying, or of the state law creating, that right-of-way and on the applicable state law rules of construction. See, e.g., Roeder Co. v. Burlington Northern, Inc., 105 Wash.2d 269, 714 P.2d 1170 (1986); Veach, 599 P.2d at 527-28; Tolke, 586 P.2d at 795-97. See generally Deed to Railroad Co. as Conveying Fee or Easement, 6 A.L.R.3d 973 (1966) (surveying state case law). State law also determines the circumstances that trigger the reversion of these rights-of-way. See, e.g., Schnabel, 428 N.E.2d at 675-77. In general, reversion depends upon abandonment by the railroad, and "in order to establish that a railroad has abandoned its right-of-way easement, it is necessary to prove actual relinquishment and the intention to abandon the use of the premises." Id. at 676. The element of intent to abandon may be inferred from the surrounding circumstances; mere non-use is probative of such intent but may not be sufficient in itself to demonstrate abandonment. Id. See generally What Constitutes Abandonment of a Railroad Right of Way, 95 A.L.R.2d 468 (1964) (surveying state case law).
 
 
 31
 These state laws operate subject to the ICC's plenary authority to regulate railroad abandonments. See Chicago & North Western Transp. Co. v. Kalo Brick & Title Co., 450 U.S. 311, 320, 101 S.Ct. 1124, 1131, 67 L.Ed.2d 258 (1981). Absent a valid certificate of abandonment from the ICC, a state may not require a railroad to cease operations over a right-of-way. New Orleans Terminal Co. v. Spencer, 366 F.2d 160 (5th Cir.1966). Nor may state law cause a reverter of a right-of-way prior to an ICC-approved abandonment. Louisiana & Arkansas Ry. v. Bickham, 602 F.Supp. 383 (M.D.La.1985), aff'd 775 F.2d 300 (5th Cir.1985). Instead, it is only after an unconditioned certificate has been issued that a right-of-way may be transferred or extinguished under state law. State of Vermont and Vermont Ry. Inc.--Discontinuance of Service Exemption--In Chittenden County Vt., 3 I.C.C. 2d 903 (1987); see Hayfield Northern R.R. Co. v. Chicago & North Western Transp. Co., 467 U.S. 622, 633, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984).
 
 
 32
 With this background in mind, we return to petitioner Beres's contention that the Trails Act Rules authorize a "taking" of her reversionary interest without compensation. Recall that under the Rules the Commission will not issue an effective abandonment certificate when the carrier and a qualified trail user have entered into a voluntary trail use agreement. Instead, the Commission will issue a Certificate of Interim Trail Use that allows the railroad to discontinue service without causing its right-of-way to lapse under state law.
 
 
 33
 Before the Commission, Beres argued that application of the Rules to the right-of-way on her property would deprive her of her reversionary interest under Washington law. The Commission noted this objection but rejected it on the following ground: "[s]ince the [amendment] provides that interim trail use under section [8(d) ] shall not constitute abandonment of rights-of-way for railroad purposes, the railroad easement continues and reversionary interests do not mature." 2 I.C.C.2d at 600. This response may accurately describe the effect of Sec. 8(d), but it does not resolve the question posed by petitioner Beres, namely, whether the postponement of a reversionary interest that would otherwise vest under state law constitutes a taking of private property for which just compensation must be made.
 
 
 34
 The Commission here advances two reasons why this question should be answered in the negative. First, although it concedes that a reversionary interest in land is "property" within the meaning of the fifth amendment, the Commission suggests that the Trail Act Rules do not authorize a taking of that property, because, "[i]n contrast to the railroad, which has a vested (i.e., present) right to dispose of its interest in the right-of-way ..., the holder of a reversionary interest has nothing more than a future interest which might never mature and which is simply postponed in the event of a trail use arrangement." ICC Brief at 40 (emphasis in original). Leaving to the margin the error in the unqualified predicate for this argument,[15] we notice that the Commission cites no authority for the proposition that government action that precludes the vesting of a reversionary interest does not constitute a taking of property. The purported proposition of law is manifestly contrary to the underlying economics--analogous to saying that a lessor's interest in his property has not been "taken" when the term of a fully paid leasehold is extended indefinitely. It is therefore not surprising that a number of sources suggest it is unsound, particularly when the event that will trigger the reversion of the interest is imminent at the time of the appropriation. See Lawson v. State of Washington, 107 Wash.2d 444, 730 P.2d 1308, 1315-16 (1986); 2 J. SACKMAN, NICHOLS ON EMINENT DOMAIN Sec. 5.05 (Rev. 3d ed. 1985) (and cases cited therein); L. SIMES, LAW OF FUTURE INTERESTS 118-19 (2d ed. 1966); L. SIMES & A. SMITH, THE LAW OF FUTURE INTERESTS Sec. 136 (2d ed. 1956); 1 RESTATEMENT OF LAW OF PROPERTY Sec. 53 comment C (1936). Nor does the Commission offer support for its suggestion that the reversionary interests are not taken merely because they are postponed indefinitely rather than terminated outright. This proposition is similarly problematic; as the Supreme Court recently reminded, "Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable." First Lutheran Church of Glendale v. County of Los Angeles, --- U.S. ----, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) (quoting San Diego Gas & Electric Co. v. City of San Diego, 450 U.S. 621, 657, 101 S.Ct. 1287, 1307, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)).
 
 
 35
 Second, the Commission argues that Congress, in enacting Sec. 8(d), expressly "preempted" any law providing for the termination of railroad easements upon the discontinuance of rail operations. Preemption of state law is neither the issue nor the answer, however. No one doubts that Congress has the authority to provide that rights-of-way no longer needed for rail use be converted to trail use, nor that state property laws to the contrary must be displaced by Congress's exercise of that authority. So much is fundamental. See U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the Supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the contrary notwithstanding."); see also Chicago & North Western Transp. Co., 450 U.S. at 319, 101 S.Ct. at 1131 ("[S]tate efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity."); Glosemeyer v. Missouri-Kansas-Texas R.R. Co., 685 F.Supp. 1108, 1113-1114, 1118 (U.S.D.C.E.D.Mo., 1988) (rejecting a reversionary owner's claim that Sec. 8(d) exceeds Congress's power under the Commerce Clause). The sole issue here in dispute is the ICC's determination that reversionary owners whose property interests are defeated by the preemptive effect of the Trails Act Rules upon state laws are not entitled to compensation. Cf. Kaiser Aetna v. United States, 444 U.S. 164, 174, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) ("In light of its expansive authority under the Commerce Clause, there is no question but that Congress could assure the public a free right of access to [a private pond made navigable as a result of improvements made by the owner] if it so chose. Whether a statute or regulation that went so far amounted to a "taking," however, is an entirely separate question.").
 
 
 36
 It is appropriate for the Commission to resolve this entirely separate "takings" question in the first instance, free of the error that caused it prematurely to truncate its analysis in the proceeding below. In order to do this, the Commission must consider the effects of the Trails Act Rules on the property rights of variously situated reversionary owners, rather than deny that such effects are legally cognizable.[16] The Supreme Court has "generally 'been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' " Kaiser Aetna, 444 U.S. at 175, 100 S.Ct. at 390 (citation omitted). Its decisions do indicate, however, several factors, including "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government's action" that are of particular significance. Id. With respect to the last-mentioned factor, the Court has uniformly found that government action that causes a permanent physical occupation of real property amounts to a taking "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35, 102 S.Ct. 3164, 3175-76, 73 L.Ed.2d 868 (1982). Accord Kaiser Aetna, 444 U.S. at 180, 100 S.Ct. at 393 ("the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within the category of interests that the Government cannot take without compensation."). Most recently, the Court has determined that a permanent physical occupation occurs "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." See Nollan v. California Coastal Comm'n, --- U.S. ----, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987).
 
 
 37
 These general principles cannot, of course, resolve the question whether the conversion of a particular right-of-way to trail use constitutes a taking. In any individual case, the effect of trail use on the reversionary owner's property rights will depend, in part, on precisely what those rights are under relevant state law. For example, two state courts have found that trail use did not extinguish a railroad easement. See Washington Wildlife Preservation, Inc. v. State of Minnesota, 329 N.W.2d 543 (Minn. 1983); Rieger v. Penn Central Corp., No. 85-CA-11, slip op. (Ct.App. Greene County, Ohio, May 21, 1985). In both cases, however, the easement at issue was not limited exclusively to railroad purposes. See Washington Wildlife, 329 N.W.2d at 546; Reiger, supra (easement created by prescription). Cases considering easements that were so limited by contract or statute have uniformly found that a change in use from rails to trails constitutes abandonment of the right-of-way. See Lawson, 730 P.2d at 1312; Schnabel, 428 N.E.2d at 673; McKinley v. Waterloo R.R. Co., 368 N.W.2d 131, 133-35 (Iowa 1985) (easement acquired through condemnation subject to statute providing for reversion if railroad not operated for eight years); see also Pollnow v. Wisconsin Dep't of Natural Resources, 88 Wis.2d 350, 276 N.W.2d 738 (1979) (easement created by prescription). In addition, while a hiking trail may constitute a "public purpose" sufficient to preserve certain unconditioned rights-of-way, trail use may still extinguish an easement if it materially increases the burden on the servient estate. See Lawson, 730 P.2d at 1319 (Pearson, J., concurring and dissenting).[17] Determining the effects of trail use on existing property interests, therefore, is necessarily a case specific process.
 
 
 38
 The Commission, with the support of NWF, seeks to sidestep this cumbersome inquiry into the effect of its Rules on the property rights of reversionary owners by stressing that the Rules serve an important rail regulatory purpose, namely, the preservation of rail transportation corridors for future rail use. They argue that this "rail banking" purpose distinguishes the Rules from a similar Washington state statute, recently invalidated by the Washington Supreme Court in Lawson v. State of Washington, 107 Wash.2d 444, 730 P.2d 1308 (1986), that simply authorized a transfer of railroad rights-of-way to public, including trail, use without providing for any resumption of rail service in the future. Wash.Rev.Code Ann. Sec. 64.04.190 (West Supp.1988). In response to this argument, Ms. Beres asserts that the rail banking rationale is a fiction because no railroad that has made the decision to go through an elaborate abandonment proceeding could realistically have any intent of reactivating rail service. Beres therefore asks us to disregard as pretextual the stated rail banking purpose of the Trails Act Rules.
 
 
 39
 Quite apart from the Rules, however, Congress specifically identified rail banking as a goal in the text of Sec. 8(d).[18] Moreover, and contrary to Beres's suggestion, there is at least some experience showing that a railroad that enters into an agreement for interim trail use may in fact intend to resume service in the foreseeable future. In Chicago & North Western Transp. Co.--Abandonment Exemption--Guthrie and Dallas Counties, IA, ICC No. AB-1 (Sub. No. 192X) (served May 20, 1987), for example, the Commission authorized interim trail use on a right-of-way that was adjacent to the site of a proposed coal-fired power station, reasonably projecting that if the power station were built, rail service would be reactivated in order to haul coal. We therefore decline to find that rail banking is necessarily a "fiction."
 
 
 40
 The Trails Act Rules do not, however, require any finding that resumption of rail service along a particular right-of-way is likely or even possible before authorizing conversion to trail use in derogation of the reversionary owner's expectancy. Nor do they provide for any procedure whereby the reversionary owner could challenge such a finding. Instead, the Commission's rules rely entirely upon the carrier and the trail group to determine whether a right-of-way will be converted to trail use; so long as the railroad and the qualified trail operator agree, the Rules seem to contemplate trail use for an indefinite period of time, regardless of whether there is any realistic possibility that rail service will be resumed.
 
 
 41
 ICC and NWF suggest that the burden placed on reversionary owners by such use is comparable to that imposed on railroads by regulations that have been sustained by the courts.[19] They point specifically to cases in which a carrier has been prohibited from abandoning service on an unprofitable line. The general rule, however, is that of Brooks-Scanlon Co. v. Railroad Comm'n of Louisiana, 251 U.S. 396, 399, 40 S.Ct. 183, 184, 64 L.Ed. 323 (1920), that:
 
 
 42
 A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage.... If the plaintiff be taken to have granted to the public an interest in the use of the railroad, it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss.
 
 
 43
 See also Bullock v. Railroad Comm'n of Florida, 254 U.S. 513, 520-21, 41 S.Ct. 193, 194-95, 65 L.Ed. 380 (1921). To be sure, the rule of Brooks-Scanlon has been qualified in later cases holding that a railroad's common carrier obligation may continue, even as to an unprofitable line, until the Commission has authorized its abandonment, without effecting a taking. See, e.g., New Haven Inclusion Cases, 399 U.S. 392, 491-92, 90 S.Ct. 2054, 2109-10, 26 L.Ed.2d 691 (1970) (abandonment delayed seven years during liquidation proceedings).
 
 
 44
 Moreover, in Lehigh & New England Ry. v. ICC, 540 F.2d 71 (3d Cir.1976), the court rejected a takings clause challenge to an ICC order under Sec. 1(16)(b) of the Interstate Commerce Act, which authorized the ICC, in certain circumstances, to direct a carrier to operate temporarily over the lines of another carrier that is unable or unwilling to provide essential rail service. The order in question provided that the directed carrier would pay no rent to the carrier that owned the track except in the unlikely event that the directed service proved to be profitable. Although the statute authorized such an arrangement for a maximum of 60 days or, if extended by the ICC for cause, an additional 180 days, the court found the taking claim "a close and difficult question." Id. at 82. Ultimately the court was persuaded that since a comparable postponement in the carrier's right to abandon would not be a taking, neither should be placing another carrier on the line for the same brief period. The court reasoned that "a railroad or its estate may be made to suffer interim reasonable losses, without compensation, for a reasonable period of time during which solutions accommodating the public and private interests can be devised." Id. at 83; accord Gibbons v. United States, 660 F.2d 1227, 1236-38 (7th Cir.1981).[20]
 
 
 45
 None of these sources, however, supports the proposition that the owner of a right-of-way may be deprived indefinitely of the use of her property without compensation therefor. On the contrary, in each of the cases cited by the parties, a temporary imposition upon the property rights of a carrier was necessary in order to ensure the continuation of existing rail service. And in each case the temporary nature of the imposition was essential to put it on the regulation side of the narrow line separating reasonable regulations from compensable takings. We are unable, therefore, to conclude that existing precedent provides that the rights of those who have an interest in railroad property may be frustrated indefinitely in order to preserve the possibility, however slight, that rail service may be resumed in the future.
 
 IV. CONCLUSION
 
 46
 In conclusion, we find the Commission's analysis of the takings issue raised by Ms. Beres insufficient to support its conclusion that the application of the Rules will never require compensation of reversionary owners. Moreover, in view of the Commission's decision to construe Sec. 8(d) so as to prevent the condemnation of railroad property, we are reluctant to assume that the Commission's interpretation of the amended Trails Act was not affected by its analysis of the takings clause issue. A remand for further consideration is therefore in order. In determining whether the current Trails Act Rules may result in a taking of private property, the Commission should give special attention to situations where the right-of-way is strictly limited to railroad use and the restoration of rail service in the future is not foreseeable. In the event that the Commission concludes that a takings problem may result, it should also consider whether any modification of the Rules is appropriate and whether special procedures should be devised to facilitate the presentation of a property owner's claim for compensation.
 
 
 
 [1]
 NWF's petition in No. 87-1317 is joined by the Rails-to-Trails Conservancy, the East Bay Regional Park District, the Heritage Trails Fund, the Iowa Trails Council, the National Parks and Conservation Association, the Nebraska Trails Council, the American Hiking Society, the American Horse Council, and the Bay State Trail Riders Association. In the interest of simplicity, these parties will be referred to collectively as "NWF."
 
 
 [2]
 Section 9(b) of the Trails Act does require a number of federal agencies, including the ICC, to cooperate with the Secretaries of the Interior and of Agriculture to ensure that properties under their control that are suitable for trail purposes are made available for such use. See 16 U.S.C. Sec. 1248(b)
 
 
 [3]
 Sections 809(a) and (b) of the 4-R Act are codified as notes to 49 U.S.C. Sec. 10906
 
 
 [4]
 49 U.S.C. Sec. 10906 applies once the Commission has determined that abandonment of a rail property is appropriate. It provides, in part, that:
 If the Commission finds that the rail properties proposed to be abandoned are suitable for public purposes, the properties may be sold, leased, exchanged, or otherwise disposed of only under conditions provided in the order of the Commission. The conditions may include a prohibition on any such disposal for a period of not more than 180 days after the effective date of the order, unless the properties have first been offered, on reasonable terms, for sale for public purposes.
 In Chicago and North Western Transp. Co.--Abandonment, 363 I.C.C. 975 (1981), the Commission determined that this statute did not authorize it to compel the transfer of railroad property for public use.
 
 
 [5]
 In a regular (i.e., regulated) abandonment, for example, the Trails Act Rules require that the abandonment notices filed by the carrier notify potential trail operators to come forward with their proposals. See 49 C.F.R. Secs. 1105.11, 1152.21 (1987). Any interested trail operator must then file a comment, including a statement of willingness to assume financial responsibility. See id. at Sec. 1152.29(a). If the Commission determines that abandonment is warranted, it will direct the railroad to inform the Commission whether it is willing to consider interim trail use. If the railroad declines to consider trail use, it will be issued a full abandonment certificate. If the railroad agrees to negotiate a trail use agreement, it will be issued a "Certificate of Interim Trail Use or Abandonment" ("CITU"), which will allow it to discontinue service, cancel tariffs, and salvage its track after 30 days and will provide 180 days for the carrier and the potential trail operator to negotiate. Id. at Sec. 1152.29(c). The CITU will also note that interim trail use is subject to restoration of rail service and will assign financial responsibility for the right-of-way to the trail operator. If negotiation fails, the CITU automatically converts to a full certificate of abandonment. If it succeeds, the CITU remains in effect until the railroad resumes service or the trail operator files a petition with the Commission to terminate trail use. Id.; 2 I.C.C.2d at 602-06, 609-10
 
 
 [6]
 Commentators have suggested that the Chevron analysis raises special concerns when the agency's interpretation of a statute serves to increase its own authority or jurisdiction; in such cases, judicial deference must not become a medium for judicial acquiescence in the agency's transgression of the limits Congress has set upon it. See, e.g., Sunstein, Constitutionalism After the New Deal, 101 Harv.L.Rev. 421, 467-68 (1987); Byse, Judicial Review of Administrative Interpretation of Statutes: An Analysis of Chevron's Step Two, 2 Admin.L.J. --- (forthcoming 1988); Kokechik Fisherman's Assoc. v. Secretary of Commerce, 839 F.2d 795, 803. (Starr, J., dissenting) (D.C.Cir.1988). Such concerns need not detain us here; "[s]ince the Commission disclaims rather than asserts a power, there is all the more reason to feel assured of its disinterestedness and to resolve ambiguity in favor of its choice of construction." Schwabacher v. United States, 334 U.S. 182, 204, 68 S.Ct. 958, 969, 92 L.Ed. 1305 (1948) (Frankfurter, J., dissenting)
 
 
 [7]
 The use of the term "or otherwise in a manner consistent with [the Trails Act]" is especially puzzling. NWF notes that the Trails Act authorizes condemnation in certain circumstances and argues that mandatory transfer of railroad rights-of-way is therefore "consistent with" the Trails Act. As the Commission points out, however, the Trails Act allows for condemnation by the Secretaries of the Interior and of Agriculture only when Congress has specifically designated a particular area for a scenic or historic trail and all other means of acquiring the necessary land have failed. See 16 U.S.C. Sec. 1246(g). A transfer of property rights mandated by the ICC whenever any qualified trial operator agrees to assume financial and managerial responsibility would not be "consistent with" this narrowly circumscribed condemnation power of the Secretaries
 
 
 [8]
 NWF disagrees. It argues that railroad property is subject to pervasive federal regulation in the interests of national transportation policy and suggests that the forced transfer of rights-of-way to trail users is less intrusive than other restrictions that have withstood challenge under the takings clause. This argument is addressed in greater detail, infra at 707-708, in connection with Ms. Beres's takings claim
 
 
 [9]
 The Commission also noted in its decision the contrast in language between Sec. 8(d) and 49 U.S.C. Sec. 10905 (1982), a statute that expressly grants the Commission the authority to force an abandoning rail carrier either to sell the line for continued rail service or to continue operating it under a subsidy. See 2 I.C.C.2d at 598
 
 
 [10]
 See H.R.Rep. No. 28, 98th Cong., 1st Sess. 8-9 (1983), U.S.Code Cong. & Admin.News 1983, p. 112:
 Section 208 amends section 8 of the Act to encourage the development of additional trails in conjunction with the provisions of the [4-R Act]. This reflects the concern that previous congressional efforts have not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes. This appears to be true despite the fact that these efforts have also been to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use.
 The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trail use will be considered prior to abandonment. If interim use of an established right-of-way consistent with the National Trails System Act is feasible, and a State, political subdivision, or qualified private organization is prepared to assume full responsibility for the management of such right-of-way, for any legal liability, and for the payment of any and all taxes that may be levied or assessed against such right-of-way--that is, to save and hold the railroad harmless from all of these duties and responsibilities--then the route will not be ordered abandoned.
 This provision will protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed, and by protecting the railroad interests from any liability or responsibility in the interim period. This provision will assist recreation users by providing opportunities for trail use on an interim basis where such situation exists.
 
 
 [11]
 In Washington State Dep't of Game v. ICC, 829 F.2d 877 (9th Cir.1987), which was decided shortly after this case was argued, the Court of Appeals resolved an apparently identical challenge to the Rules, by similar reasoning, with the same result. See also Connecticut Trust for Historic Preservation v. ICC, 841 F.2d 479, 483 (2d Cir.1988) (holding that Sec. 8(d) does not clearly confer the power to order trail use)
 
 
 [12]
 Beres also advances two separate arguments that warrant only brief mention. First, she asserts that the Trails Act Rules violate the contracts clause, U.S. Const. art. I, Sec. 10. That prohibition applies only to state laws. Any claim that federal legislation unlawfully impairs existing contracts falls under the due process clause of the fifth amendment. To prevail on a due process claim, petitioner must overcome a presumption of constitutionality and demonstrate that "the legislature has acted in an arbitrary and irrational way." National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe R.R., 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985) (internal quotations omitted). This she has not even attempted to do
 Second, Beres claims that the Trails Act Rules are invalid because they appropriate property for private purposes. There can be no doubt that the purposes advanced by the Rules, namely, the establishment of interim nature trails and the long run preservation of existing railroad rights-of-way, are "public"; assuming arguendo that they constitute a taking, the participation of private organizations does not alter their public purpose, and "it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause." Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 244, 104 S.Ct. 2321, 2331, 81 L.Ed.2d 186 (1984).
 
 
 [13]
 Because an easement is a servitude, rather than an estate in land, it is not strictly accurate to speak of an easement "reverting"; rather, such interests "lapse" or are "extinguished." Nonetheless, for the sake of simplicity, we refer to the rights retained by any person in property that is subject to a railroad right-of-way as a "reversionary interest" and the event that causes these persons to regain unencumbered possession of the land as "reversion."
 
 
 [14]
 A large proportion of existing rights-of-way were created by Congress during the nineteenth century through grants of public lands. See generally C. GOODRICH, GOVERNMENT PROMOTION OF AMERICAN CANALS AND RAILROADS, 1800-1890 (1960); Idaho v. Oregon Short Line R.R. Co., 617 F.Supp. 207, 210 (D.Idaho 1985). These interests may be subject to 43 U.S.C. Sec. 912 (1982), which allows a state or local agency to use abandoned rights-of-way that were granted by the federal government as "public highways."
 
 
 [15]
 The Commission's assumption that all owners of reversionary interests have only a future interest in railroad rights-of-way is inaccurate. As we noted above, many rights-of-way are easements rather than interests in fee. See supra at 703. A landowner whose property is subject to a railroad easement may retain a vested interest in the underlying property, and indeed may enjoy a present right to use that property in any manner that is not inconsistent with the railroad's use. This vested right may be incompatible with the right-of-way's use as a trail. See Veach v. Culp, 92 Wash.2d 570, 599 P.2d 526, 528 (1979); see also Lawson v. State of Washington, 107 Wash.2d 444, 730 P.2d 1308, 1315 (1986) (noting that the owners of property bisected by railroad rights-of-way "presently own fee interests underlying the rights-of-way.")
 
 
 [16]
 In considering the effects of the Rules, the relevant comparison is between the rights of the owners before and after the application of the Rules and not, as the Commission appears to assume, the rights of the owners under the Rules before and after the cessation of rail service on the right-of-way. We therefore reject the Commission's suggestion that the Trails Act Rules do not work a taking on the ground that they "protect and preserve the reversionary interest throughout the interim trail use process." See ICC Brief at 41. As the Supreme Court of Washington recently noted in considering a takings challenge to state statutes that provided for trail use on abandoned railroad rights-of-way:
 The argument that the statutes are valid because they do not 'eliminate' plaintiffs' reversionary interests strains credulity. Without the statutes, the holders of the reversionary interests would absolutely and automatically obtain possession of the easements upon railroad abandonment. Under the statutes, they would not.
 Lawson, 730 P.2d at 1313.
 
 
 [17]
 We decline NWF's invitation to declare ex cathedra that trail use is not "more noxious than rail use" or that it "enhances adjacent property values." See NWF Supp. Brief at 7. Indeed, the facts alleged by Ms. Beres suggest that in her case, trail use could have a dramatic adverse effect on her enjoyment of her property by transforming her private waterfront into a public beach
 
 
 [18]
 Revised Sec. 8(d) of the Trails Act states that it is "in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. Sec. 1247(d)
 
 
 [19]
 As NWF suggests, the ICC's position here is in considerable tension with its determination that mandatory trail use of rights-of-way owned by railroads in fee would constitute a "taking" of the railroad's property interest. See supra at 698; 2 I.C.C.2d at 596-97
 
 
 [20]
 The public's interest in continued rail service has also been found sufficient to justify an ICC order requiring the trustee of a bankrupt railroad to give preference in the sale of a line to a bidder that intended to operate an excursion railroad and was willing to pay an amount equal to the high bid received from a non-operator. See Reed v. Meserve, 487 F.2d 646 (1st Cir.1973); see also 49 U.S.C. Sec. 10905 (railroad may be compelled either to accept operating subsidies or to sell the line to a carrier that will continue operation)